# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

### CASE NO. 12-22787-CIV-GRAHAM/GOODMAN

COMMERCIAL LONG TRADING
CORP., a Florida corporation,

      Plaintiff,

v.

SCOTTSDALE INSURANCE CO.,

      Defendant.

_____/

## ORDER DENYING DEFENDANT'S MOTION FOR SANCTIONS
## FOR SPOLIATION OF EVIDENCE

The Honorable Donald L. Graham referred Defendant Scottsdale Insurance Company's ("Scottsdale") Motion for Sanctions for Plaintiff Commercial Long Trading Corporation's ("Commercial Long") Spoliation of Evidence to the Undersigned. [ECF Nos. 20; 72]. In its motion, Scottsdale seeks extreme relief. Scottsdale asks for an order striking Commercial Long's pleadings and dismissing the case with prejudice, precluding Commercial Long from offering trial evidence about the cause of the alleged damage or, alternatively, a jury instruction establishing a "conclusive presumption that i) Plaintiff had a contractual duty under the policy to preserve the damaged property after the alleged loss for Scottsdale to inspect it, and ii) Plaintiff failed to comply with its contractual duty to preserve the damaged property by destroying same." [ECF No. 72, p. 16].

The Undersigned has reviewed the motion and Commercial Long's response. [ECF No. 77]. In addition, the Undersigned held an all-day evidentiary hearing and reviewed other post-hearing submissions. [ECF Nos. 95, 96, 97, 98, 99, 101 and 103].

Because Scottsdale has not established bad faith, an Eleventh Circuit requirement for imposing spoliation sanctions in Florida, the Undersigned **DENIES** Scottsdale's motion.[1]

By denying the request for spoliation sanctions, the Undersigned is neither ruling on, nor making a recommendation about, Scottsdale's pending summary judgment motion. That motion, which has not been referred to the Undersigned, is based on many of the same facts and arguments raised in this sanctions motion. In fact, Scottsdale's summary judgment motion was filed on the same day as the sanctions motion. In its summary judgment motion, Scottsdale contends that Commercial Long failed to comply with its *contractual* obligations under the insurance policy. But the

---

[1]     As a federal magistrate judge, the Undersigned has authority to enter an order, as opposed to a report and recommendations, denying a motion for sanctions. Fed. R. Civ. P. 72(a) authorizes magistrate judges to issue orders on any type of "pretrial matter not dispositive of a party's claim or defense." In determining between dispositive and non-dispositive sanctions, the critical factor is what sanction the magistrate judge *actually* imposes, rather than the one *requested* by the party seeking sanctions. *Gomez. v. Martin Marietta Corp.*, 50 F.3d 1511, 1519-20 (10th Cir. 1995). *See generally Moore v. Napolitano*, 723 F. Supp. 2d 167 (D.D.C. 2010) (rejecting argument that the magistrate judge entered a severe sanction akin to a litigation-ending default and affirming order precluding defendant from offering certain evidence at trial). In fact, federal magistrate judges in this circuit often enter orders when parties seek sanctions, including default judgments or dismissals, for spoliation. *See Calixto v. Watson Bowman Acme Corp.*, No. 07-60077-CIV, 2009 WL 3823390 (S.D. Fla. Nov. 16, 2009).

present sanctions motion requires significantly more — an affirmative showing of **bad faith**.

This Order (denying Scottsdale's sanctions motion) does not preclude Scottsdale from seeking to introduce evidence at trial of Plaintiff's alleged failure to preserve evidence or to comply with other contractual duties raised in the spoliation sanctions motion. Of course, the Undersigned is not prejudging the relevance or admissibility of such evidence at trial. But, given that Scottsdale has raised several contract-based affirmative defenses involving the same facts in both motions, the Undersigned emphasizes that this ruling is not to be construed as a comment about the pending summary judgment motion or, if there is a trial, on Scottsdale's ability to use some or all of the relevant evidence in connection with its affirmative defenses.[2] The issue of trial admissibility is not before me, and I therefore will not analyze it here. For the present sanctions motion, it is enough to say that Scottsdale has not demonstrated the requisite bad faith on Commercial Long's behalf to justify sanctions.

---

[2]    In its answer [ECF No. 24], Scottsdale asserts four affirmative defenses. The first, second and fourth defenses involve many of the same facts that are at issue in the sanctions motion. Specifically, these three affirmative defenses contend that Commercial Long breached its obligations under the insurance policy by removing, dismantling and destroying the sugar-filled silos which were damaged. According to Scottsdale, these alleged activities breached Commercial Long's contractual duties to give Scottsdale the opportunity to timely and adequately inspect the damaged property after the loss, to preserve evidence of the loss, and to cooperate in the investigation or settlement of the claim.

## I.  Legal Standards

### a.  Spoliation

In a diversity lawsuit such as this one, federal law governs the imposition of spoliation sanctions because spoliation sanctions constitute an evidentiary matter. *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005). Although federal law governs, a court may look to state law for guidance to the extent that it is consistent with federal law. *Managed Care Solutions, Inc. v. Essent Healthcare, Inc.*, 736 F. Supp. 2d 1317, 1322 (S.D. Fla. 2010).

Spoliation is the "*intentional* destruction, mutilation, alteration, or concealment of evidence." *Calixto v. Watson Bowman Acme Corp.*, No. 07-60077-CIV, 2009 WL 3823390, at *13 (S.D. Fla. Nov. 16, 2009) (emphasis added) (citing *Black's Law Dictionary* 1437 (8th ed. 1999)); *see Southeastern Mech. Servs, Inc. v. Brody*, No. 8:08-CV-1151-T-30EAJ, 2009 WL 2242395, at *2 (M.D. Fla. July 24, 2009) (spoliation is "the intentional destruction or concealment of evidence"); *cf. Green Leaf Nursery v. E.I. DuPont de Nemours & Co.*, 341 F.3d 1292, 1308 (11th Cir. 2003) (spoliation defined as the destruction of evidence or the significant and meaningful alteration of a document or instrument, without reference to intentionality). Courts in this circuit have been inconsistent as to whether spoliation includes intent.[3] Because the Eleventh Circuit's decision in *Green Leaf Nursery* did not

---

[3]     For example, the "intentional" component *is* included in the spoliation definitions in *Optowave Co., Ltd. v Nikitin*, No. 6:05-CV-1083-Orl-22DAB, 2006 WL 3231422 (M.D. Fla. Nov. 7, 2006), *Southeastern Mechanical Servs.*, 2009 WL 2242395, and

include "intentional" in its definition of the destruction of evidence requirement for spoliation, the Undersigned will not include that requirement in the analysis.

In meeting the requirement to demonstrate that the spoliated evidence was **crucial** to the movant's ability to prove its *prima facie* case or defense, it is not enough for the movant to show only that the spoliated evidence would have been *relevant* to a claim or defense. *See Managed Care Solutions*, 736 F. Supp.2d at 1327-28 (finding that the allegedly spoliated evidence was not **crucial** to the plaintiff's claims because it could still prove its case through other evidence already obtained elsewhere); *Floeter v. City of Orlando,* No. 6:05-cv-400-Orl-22KRS, 2007 WL 486633, at *6 (M.D. Fla. Feb. 9, 2007) (missing emails were not **critical** to plaintiff's case).

A party is permitted to ask the trial court to allow it to introduce into evidence at trial the circumstances surrounding the opposition's failure to retain and produce evidence, even when the trial court rejects the request for an adverse inference jury instruction. *Managed Care Solutions,* 736 F. Supp.2d at 1334.[4]

---

*Calixto*, 2009 WL 3823390. The "intentional" factor is not included in *Graff v. Baja Marine Corp.,* 310 F. App'x 298 (11th Cir. 2009), *Corporate Financial, Inc. v. Principal Life Ins. Co.,* No. 05-20595-CIV, 2006 WL 3365606 (S.D. Fla. Nov. 20, 2006), and *Green Leaf Nursery*. *Graff*, however, is a "not for publication" opinion based, in part, on Georgia law.

[4]     Therefore, the Undersigned's Order denying Scottsdale's requested sanctions does not automatically prevent the presentation of evidence concerning the alleged spoliation at trial.

### b.  Sanctions & Spoliation Sanctions

A court has broad discretion to impose sanctions for litigation misconduct based on its inherent power to manage its own affairs. In order to impose sanctions based on the court's inherent power, however, a finding of bad faith is required. *In re Mroz*, 65 F.3d 1567, 1575 (11th Cir. 1995) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 49 (1991)). In this circuit, sanctions for spoliation of evidence may include: "(1) dismissal of the case [or default judgment against defendant]; (2) exclusion of expert testimony; or (3) a jury instruction on spoliation of evidence which raises a presumption against the spoliator." *Flury*, 427 F.3d at 945. In the instant case, Scottsdale urges the first and third type of sanctions — the third of which includes the imposition of an adverse inference.[5]

There are different types of adverse inferences, ranging in ever-increasing levels of harshness. The harshest type results in a jury being instructed that certain facts are deemed admitted and must be accepted as true. A second type results in the imposition of a mandatory, albeit rebuttable, presumption. The least-harsh type of adverse inference permits a jury to presume that the lost evidence is relevant and favorable to the innocent party. With this third type of adverse inference, the jury also considers the spoliating party's rebuttal evidence and then decides whether to draw an adverse

---

[5]     Scottsdale has also filed a separate motion [ECF No. 71] to strike the opinions of Commercial Long's expert witness – but on grounds largely unrelated to the alleged spoliation. The motion to exclude is based largely on Scottsdale's challenge to the expert's methodology. The District Court has not referred that motion to the Undersigned, though.

inference. *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d 456, 470 (S.D.N.Y. 2010) *abrogated on other grounds by Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135 (2d Cir. 2012).

In this case, Scottsdale, as the moving party on its spoliation sanctions motion, carries the burden of proof. "[T]he party seeking [spoliation] sanctions must prove . . . first, that the missing evidence existed at one time; second, that the alleged spoliator had a duty to preserve the evidence; and third, that the evidence was crucial to the movant being able to prove its prima facie case or defense." *Walter v. Carnival Corp.*, No. 09-20962-CIV, 2010 WL 2927962, at *2 (S.D. Fla. July 23, 2010) (citing *Floeter*, 2007 WL 486633, at *5); *see also Managed Care Solutions*, 736 F. Supp. 2d at 1322.

### c. Bad Faith Requirement

But even if all three of the other spoliation elements are met, "[a] party's failure to preserve evidence" rises to the level of sanctionable spoliation in this circuit "only when the absence of that evidence is predicated on **bad faith**," such as where a party purposely "tamper[s] with the evidence." *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997) (emphasis added); *see also Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1294 (11th Cir. 2003) (no adverse inference from missing label because there was no indication of bad faith). Mere negligence in losing or destroying records or evidence is

insufficient to justify an adverse inference instruction for spoliation. *Bashir,* 119 F.3d at

931.[6]

Given this circuit's requirement that an adverse inference flowing from

spoliation requires the presence of bad faith, even **grossly negligent** conduct would not

justify that type of jury instruction when it is not accompanied by bad faith. *See generally*

*Preferred Care Partners Holding Corp. v. Humana, Inc.*, No. 08-20424-CIV, 2009 WL 982460,

at *7 (S.D. Fla. Apr. 9, 2009) (declining to order adverse inference even though party's

performance in fulfilling discovery obligations was "clearly egregious" and "resulted

from the grossly negligent oversights of counsel"). Because this circuit requires a

showing of bad faith before sanctioning a party when there is spoliation of evidence,

---

[6]     Although the Eleventh Circuit indicated in *Flury* that bad faith is only one factor
to consider under Georgia spoliation law, *Flury* does **not** stand for the proposition that
bad faith is not required in this circuit for an adverse inference jury instruction based on
spoliation of evidence under Florida law. Several reasons support this conclusion. First,
*Flury* construed Georgia spoliation law, not Florida spoliation law. Second, *Flury* was "a
panel decision and as such did not overrule the prior panel decision in Bashir . . .
requiring a showing of bad faith." *Managed Care Solutions*, 736 F. Supp. 2d at 1328, n.16
(noting that only the Supreme Court or an en banc decision from the Eleventh Circuit
can judicially overrule a prior panel decision). Third, in several cases following the 2005
*Flury* decision, the Eleventh Circuit has unequivocally held that bad faith is required for
an adverse inference instruction as a spoliation sanction. *See, e.g., Mann v. Taser Int'l,
Inc.,* 588 F.3d 1291, 1310 (11th Cir. 2009) (noting that a showing of malice is not required
to find bad faith but emphasizing that an adverse inference can be "drawn from a
party's failure to preserve evidence only when the absence of that evidence is
predicated on bad faith"); *Cox v. Target Corp.,* 351 F. App'x 381, 383 (11th Cir. 2009)
("jury instruction on spoliation of evidence is required only" when bad faith is
responsible for the absence of the evidence); *BP Prods. N. Am., Inc. v. Southeast Energy
Grp., Inc.,* 282 F. App'x 776, 780 n.3 (11th Cir. 2008) (holding that an adverse inference
presumption was appropriate where the district court implicitly determined that the
defendant's actions were predicated on bad faith).

courts in this circuit must refrain from imposing sanctions when no bad faith is shown. *See Slattery v. Precision Response Corp.*, 167 F. App'x 139, 141 (11th Cir. 2006) (employer's failure to produce documents did not justify an adverse inference because plaintiff had demonstrated no evidence of withholding or tampering with any of the documents in bad faith, and was therefore not sanctionable). *See also Penalty Kick Mgmt.*, 318 F.3d at 1293-94 (no evidence of bad faith in losing label at issue in lawsuit alleging improper disclosure of trade secrets).

In fact, district courts in our circuit regularly deny adverse inference requests even when there is an indisputable evidence of destruction or loss of evidence. *Socas v. Northwestern Mut. Life Ins. Co.*, No. 07-20336, 2010 WL 3894142 (S.D. Fla. Sept. 30, 2010) (denying motion to dismiss and for adverse inference jury instruction when doctor negligently failed to suspend her ordinary policy of purging inactive patient files after learning the information in those files was relevant to her disability claim); *Managed Care Solutions*, 736 F. Supp. 2d at 1332; *Walter*, 2010 WL 2927962 (missing broken deck chair in lawsuit for injuries sustained when plaintiff's deck chair collapsed while he was a cruise ship passenger); *Atlantic Sea Co.*, 2010 WL 2346665 (failure to preserve spotlight and electrical wiring); *Calixto*, 2009 WL 3823390, at *14-17 (missing emails). *See also United States v. Barlow*, 576 F. Supp. 2d 1375, 1381 (S.D. Fla. 2008) (loss of PVC marker used to identify the location of a ship's grounding in a lawsuit brought by the

government for damage to underwater sanctuary resources when defendant's boat ran aground).

## II.     Factual Background

Scottsdale issued a surplus lines insurance policy ("the policy") to Commercial Long, insuring against certain losses to Commercial Long's real property in Miami. Commercial Long procured the insurance coverage from Fortun Insurance, Inc. ("Fortun"), a general insurance agent.

The "Duties in the Event of Loss or Damage" provisions of the policy requires Commercial Long to, among other things: "(4) Take all reasonable steps to **protect the Covered Property from further damage,** and keep a record of your expenses necessary to protect the Covered Property . . . **Also, if feasible, set the damaged property aside and in the best possible order** for examination." [ECF No. 66-1, p. 59] (emphasis added). Section (6) of the policy requires the insured to: "As often as may be reasonably required, **permit us to inspect** the property proving the loss or damage and examine your books and records [and] permit us to take **samples of damaged and undamaged property for inspection, testing and analysis**." [*Id.*] (emphasis added). Section (8) of the policy requires Commercial Long to: "**Cooperate with us** in the investigation or settlement of the claim." [*Id.*] (emphasis added).

On November 14, 2011, while the policy was in effect, four of six sugar-filled silos at the covered site failed and collapsed, spilling approximately 600,000 pounds of

sugar and causing significant damage to the silos, many of which collapsed onto each other. Ommar Giraud ("Giraud"), the principal of Commercial Long, rushed to the business property and confronted a chaotic scene. Giraud and his employees were extremely worried about the spilled sugar. Specifically, they were concerned about the possibility that large numbers of bees would come to the area because of the sugar. Commercial Long was already familiar with the risks associated with bees, as a bee had stung the engineer of a train as it was passing by Commercial Long's property several months earlier, prompting the railroad to complain to Commercial Long. Additionally, Giraud was worried that the spilled sugar might flow over onto the nearby railroad tracks if it rained. They also worried that the sugar, which they described as highly flammable, might catch fire from the sparking wires dangling over the property.

In order to remove the spilled sugar, Commercial Long needed to cut open a manhole into the first downed silo, so that workers could get into the silo with shovels and remove sugar (and so that a bobcat machine could drive into the silo and remove sugar). And, because the silos had collapsed onto each other, Commercial Long needed to cut up each silo into smaller pieces and remove those pieces in order to get access to the next silo.

In addition to these challenges, Commercial Long also had significant electrical problems caused by the silos' collapse. According to Giraud, the downed electric lines

were sparking, generating a risk of electrocution. Finally, the ground in and around the silos was strewn with debris, creating a risk for anyone walking in the area.

Giraud instructed his employees on the same day of the silos' collapse to start cleaning up the sugar and to start cutting up the silos. According to Giraud, he provided telephone notice of the damage to Alejandro Gonzalez ("Gonzalez"), his insurance agent at Fortun, on November 15, 2011, the day after the silos' collapse. Gonzalez, however, testified that the telephone notice was provided on November 16, 2011, two days after the incident.

In either case, Fortun did not provide notice to *its* general agent (who, in turn, was expected to provide notice to Scottsdale) until Monday, November 21, 2011. Fortun took the position that the initial telephone notice it received from Commercial Long was too general to cause it to notify its general agent. Because Commercial Long allegedly did not provide additional details about the loss until after 5:00 p.m. on Friday, November 18, 2011, the Fortun employee assigned the task of receiving and forwarding claims did not see the additional information until the following Monday and, therefore, did not forward notice to its agent until the following Monday, November 21, 2011.

The instructions that Gonzalez provided to Giraud about what steps Commercial Long could take to mitigate the loss without approval from the insurance company or

its adjuster were all provided orally. It is perhaps not surprising, then, that the record is inconsistent about the exact directions Gonzalez provided.

According to Gonzalez, he received what he deemed an "empty email" from the insured on November 16, 2011. This email consisted solely of a photograph of the site, with no text. Gonzalez said he spoke to Giraud that same day (i.e., two days after the incident). Gonzalez testified that he gave instructions and advice to Giraud during this first phone call. Specifically, Gonzalez said, he advised Giraud to take videos and photographs of the damaged silos and the surrounding area, to preserve the property, to document everything, and to wait for the adjuster before taking any steps beyond the bare minimum necessary steps to eliminate significant risk to persons and property.

Moreover, Gonzalez explained, Giraud never told him that he had already cut into one or more of the silos by the time they spoke on the phone or of his plans to cut up the silos into additional pieces. To the contrary, Gonzalez testified that he first learned that Commercial Long had cut up the silos when he read language mentioning this activity in a subpoena served on Fortun after this lawsuit was filed. In any event, because Giraud never told Gonzalez that the silos were being cut or would be cut, Gonzalez said he never told Giraud not to cut the silos.

Giraud's version of his oral communication with Gonzalez is somewhat different. First, Giraud said he contacted Gonzalez on November 15, not November 16.

13

Second, Giraud testified that Gonzalez reassured him that he (Gonzalez) was going to "take care of everything" relating to the claim. Third, Giraud said that Gonzalez did not even have the name, telephone number or contact information for the adjuster and that he made repeated requests to Gonzalez and other Fortun staffers to arrange for an adjuster to visit the property. Fourth, Giraud said Gonzalez told him it was safe to take steps to deal with the emergency, and told him that the photos he took while dealing with the cleanup would be his evidence of the loss.

After dismantling the silos, Commercial Long's employees placed the cut-up pieces into a cargo container leased from Sea Star Line ("Sea Star"), a shipping company.[7] After a number of weeks, however, Giraud explained that Commercial Long needed to dump the pieces from the silos because the demurrage costs for the container were becoming exorbitant. Furthermore, Giraud explained, Sea Star would not provide Commercial Long with additional storage containers until the one used to store the cut-up silo pieces was returned.

Giraud testified that he orally told Gonzalez that he was going to discard the pieces from the silos. Giraud did not, however, take photographs or a video of the cut-up pieces in the container before the container was taken to the dump. This testimony is inconsistent with Gonzalez's testimony at the hearing, as Gonzalez unequivocally contended that he was never told that the silos were being cut into pieces.

---

[7]     In a pre-hearing deposition, Mr. Giraud explained that the container is 45 feet by 12 feet. [ECF No. 67-1, p. 135].

Commercial Long also stored some of the legs, braces and hardware from the silos in a storage area in the main building. There was no way of knowing which pieces came from which silo, though.

Robert Byron ("Byron"), an independent adjuster assigned to visit the property by Scottsdale, received notice of the claim on November 29, 2011. Byron said he made several efforts by telephone to arrange an inspection but was unable to schedule one until December 15, 2011. By the time Byron arrived to inspect the property on December 15, the four damaged silos had been removed and most of the hardware used to anchor the silos was missing. Before he arrived, Byron had no idea that Commercial Long had removed the silos. He was shown some hardware in an interior room but was unable to determine the cause of the loss.

The Undersigned has reviewed 72 color photographs that Byron took during the inspection. [ECF No. 103]. Those photographs do not show the damaged silos (which had been removed by then), but they do depict the undamaged silos and some miscellaneous hardware. Nevertheless, Byron conceded at the evidentiary hearing that he likely would not have been able to determine the cause of the loss even if the toppled silos had remained where they had fallen. The Commercial Long claim was the first silo damage claim Byron had ever handled and he admitted in a pre-hearing deposition that he lacked the experience and expertise to determine the cause of the loss in these situations. In any case, Byron's job was not to determine the cause of the damage.

15

Byron's job was to collect facts. If the bulk of the material from the silos had not been removed from the site, then Byron believes "it would have led to [sic] further experts to determine the exact cause of loss." [ECF No. 95-1, p. 7].

At the hearing, Byron testified that he does not know if Giraud told him what happened to the missing four silos and he could not recall whether he ever asked Giraud about it. Byron's report does not contain any information about these issues.

Scottsdale arranged for an engineer, Greg Loomis ("Loomis"), to inspect the property on January 19, 2012. Loomis testified at the hearing and explained that he saw two relocated silos and some hardware and other parts in a storage room. Loomis said that most of the material used to anchor the four damaged silos had been removed, though a few portions of a few posts remained at the installation site.

In his report, Loomis noted that: (1) "**most of the loose debris from the collapsed silos had been removed** from the platform, preventing us from examining the 'as found' condition after the claimed event" [ECF No. 65-2, p. 3] (emphasis in original); (2) "[s]ome of the support structure pieces were preserved, but there was no way to tell which pieces came from which silo, or which pieces went together with each other" [*id.* at p. 9]; and (3) "[t]here was no way for us to identify the specific components that were involved in the initial failure." [*Id.*].

Although the dismantled four silos had been cut up and removed by the time of Loomis' inspection, his report still contained the following opinions: (1) because there

16

was no severe weather in the area at the time of the silos' collapse, "the collapse was not caused by extreme weather or any other outside source" [*id.*]; (2) the "failure must be the result of some latent defect or deterioration affecting critical support components" [*id.*]; (3) the "next most likely cause would be some latent manufacturing or installation defect that gradually weakened over the six years that these silos were in use" [*id.*]; and (4) he "identified some potential deficiencies in the installation of the silos [but] would need to review the actual structural plans and shop drawings for the silos to evaluate whether or not these conditions . . . directly contributed to the collapse." [*Id.* at p. 10].

### III.   Analysis

The Eleventh Circuit has stated that "[t]he key to unlocking a court's inherent power [to impose sanctions for spoliation] is a finding of bad faith." *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998). Parties can establish the requisite bad faith through either direct or circumstantial evidence. *Calixto*, 2009 WL 3823390, at \*16. Scottsdale has not called the Undersigned's attention to any direct evidence of bad faith. The Undersigned will therefore determine whether Scottsdale demonstrated the requisite bad faith through the use of circumstantial evidence.

In order to demonstrate that Commercial Long destroyed evidence in bad faith through circumstantial evidence, Scottsdale must establish all of the following four factors: (1) evidence once existed that could fairly be supposed to have been **material** to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an

affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator. *Calixto*, 2009 WL 3823390, at *16. *See also Managed Care Solutions*, 736 F. Supp. 2d at 1331-32 (adopting four-factor test for circumstantial evidence of bad faith). Because the Undersigned concludes that Scottsdale has failed to demonstrate the existence of the third and fourth factors, the Undersigned need not analyze the first two factors.

Based on the record evidence, the Undersigned cannot conclusively find that Commercial Long knew of its full duty to preserve evidence in the days and weeks immediately following the silos' collapse. Although the insurance policy contained language requiring preservation of evidence, it also required a provision mandating mitigation of damage. Furthermore, it seems as though Commercial Long did not have a copy of the policy at the time of the incident. Finally, the communications between Giraud and Gonzalez may have been reasonably construed by Giraud to permit him and his employees to cut up the silos in order to remove the sugar.

The decision to discard the cut-up pieces of the silos weeks after the incident is of a different type than the immediate decision to cut up the silos. Nevertheless, Giraud testified that Gonzalez approved of his decision to discard the pieces by taking the shipping container to the dump. The Undersigned recognizes that Gonzalez denies this,

but this factual conflict is a classic dispute which a jury or fact-finder needs to resolve. *See Feliciano v. City of Miami Beach*, No. 12–11397, 2013 WL 425445, at *7 (11th Cir. Feb. 5 2013) (finding that contradictory factual statements present "a classic swearing match, which is the stuff of which jury trials are made"). The Undersigned cannot deem one witness to be credible and brand another as not credible in order to justify a severe sanctions order before a trial has occurred.

Perhaps more importantly, Scottsdale cannot meet the fourth and final element to prove bad faith by circumstantial evidence. Commercial Long has provided testimony from several witnesses about the emergency they confronted and the legitimate safety concerns that prompted Giraud and his employees to take immediate action. Given that even Gonzalez does not claim to have specifically told Giraud not to cut up the silos or dismantle the installation hardware, Commercial Long's good faith explanation of why it did so can certainly be considered a credible one.

Because Scottsdale has not established all of the elements of circumstantial bad faith – and has not introduced any direct evidence of bad faith – it is not entitled to spoliation sanctions. *See Bashir*, 119 F.3d at 931 (holding that destruction of evidence must be predicated on bad faith in order to sustain an adverse inference sanction, and that mere negligence is not sufficient to support an adverse inference). Scottsdale's implicit argument that bad faith can be assumed on Commercial Long's part because of

19

the dismantling of the silos and the related hardware is not strong enough to support the requested finding of spoliation.

Although Commercial Long discarded the cut-up silos after an adjuster failed to appear for an inspection after a month had passed, it also saved *some* of the hardware in a storage room -- a measure which permitted an engineer to evaluate the material. Therefore, the Undersigned cannot ignore that Commercial Long might have done a far-more-competent job of destroying evidence (by, for example, also discarding *all* the material it saved) it if had been acting in bad faith or intentionally scheming to spoliate evidence. *See Sampson v. City of Cambridge, Md.,* 251 F.R.D. 172, 182 (D. Md. 2008) (holding that defendants' conduct did not rise to the level of bad faith, despite not issuing a litigation hold, because, *inter alia*, employees had been instructed to retain their files and defendants had, in fact, produced hundreds of e-mails); *Walter*, 2010 WL 2927962, at *2 (denying plaintiff's motion for an adverse presumption jury instruction based on fact that defendant lost supposedly "crucial" deck chair, noting that defendant "willingly produced *other* evidence demonstrating the construction and condition of broken chair") (emphasis added).

## IV.    Conclusion

Scottsdale has not met its burden of establishing that evidence crucial to its defense case was destroyed in bad faith. Consequently, the Undersigned cannot impose any of the requested sanctions. The Undersigned therefore **DENIES** Scottsdale's

sanctions motion. This ruling does not bar Scottsdale from seeking to introduce evidence at trial that Commercial Long cut up the four damaged silos and discarded the pieces and much of the related hardware before Scottsdale or its agents could inspect them. *Managed Care Solutions*, 736 F. Supp. 2d at 1334.

    **DONE AND ORDERED** in chambers at Miami, Florida, this 15th day of March, 2013.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Honorable Donald L. Graham
All counsel of record